UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 JAN 28 P 4: 19

U.S. DISTRICT COURT
DISTRICT OF MASS.

ANTHONY ZANUCCOLI   )
          )
   v.     ) CIVIL NO. 04-12170-JLT
          )
UNITED STATES OF AMERICA )
          )

## GOVERNMENT'S RESPONSE TO PETITION UNDER SECTION 2255 AND REQUEST FOR SUMMARY DISMISSAL

On July 10, 2003, Anthony Zanuccoli pled guilty to the three drug charges pending against him.  The plea was entered only after Zanuccoli signed a plea agreement which relieved him from the mandatory life sentence he otherwise faced and only after the district court conducted a thorough colloquy to ensure that he knew what he was doing.

Under the terms of the Plea Agreement (attached as Exhibit 1), Zanuccoli: (i) acknowledged that Melanie Thompson had died as a result of heroin he had sold her, thereby subjecting him to a mandatory life sentence pursuant to 21 U.S.C. § 841 (b)(1)(C);[1] (ii) agreed that the proper disposition in his case was 240 months; and, (iii) agreed to waive both his appeal rights and any right he could have had to have the overdose issues put to a

---

[1] Under section 841, an individual who sells drugs that result in the death of another is, based on that fact alone subject to a 20 year mandatory minimum sentence.  Where, as here, the defendant also has prior felony drug convictions, the sentence becomes mandatory life imprisonment. 21 U.S.C. §841(b)(1)(C).

1

jury. Plea Agreement at ¶3.   The Plea Agreement also contained an acknowledgment in which Zanuccoli stated that he had read (and understood) the Plea Agreement, had an opportunity to discuss it with his counsel (Federal Defender Leo Sorokin), and that he was fully satisfied with Attorney Sorokin's representation. Id., page 9.

On October 3, 2003, this Court sentenced Zanuccoli to 240 months in accordance with the terms of the Plea Agreement.  At sentencing, Zanuccoli was advised both of his right to appeal and that the Plea Agreement contained a limitation on his appeal rights.  See Transcript of October 3, 2004 ("Sentencing Tr.") at 4-5.[2]

Having got the benefit of the bargain he made, Zanuccoli did not appeal his sentence.  Indeed (not unsurprisingly in view of Attorney Sorokin's negotiation of an agreement that spared Zanuccoli from spending the rest of his life in jail), the record contains nothing to indicate that Zanuccoli ever expressed any dissatisfaction with Attorney Sorokin's representation.

Until now.  On October 8, 2004 (almost a year to the day after his sentencing), Zanuccoli filed the present petition under 28 U.S.C. § 2255 alleging that Attorney Sorokin provided him with ineffective assistance of counsel.  Specifically, Zanuccoli has

---

[2]  A copy of the sentencing transcript is attached as Exhibit 2.

2

asserted four separate claims of ineffective assistance. They include: (i) that Attorney Sorokin failed to file a notice of appeal after Zanuccoli supposedly directed him to do so (Petition, Claim 1); (ii) that Attorney Sorokin withheld information from Zanuccoli that the victim was trying to commit suicide and that this, together with Zanuccoli's alleged status as a "co-purchaser" and "drug addict" somehow gave rise to a defense in the underlying case (Petition, Claim 2); (iii) that Attorney Sorokin failed to advise Zanuccoli of his rights under Apprendi v. New Jersey, 530 U.S. 466 (2000) to have the overdose issues decided by a jury at trial (Claim 3), and, (iv) that Attorney Sorokin improperly advised Zanuccoli that his sentence was not governed by the United States Sentencing guidelines but was rather driven by statutory mandatory minimums. (Petition, Claim 4).

The government is filing this response to each of the claims in the Petition. As set forth more fully below, Claims 2,3, and 4, are belied by the undisputed facts, ignore controlling law, and must be summarily dismissed. Although Claim 1 has been carefully calculated to state a cognizable claim under Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029 (2000), that claim is also exposed as a complete fabrication by the express terms of the Plea Agreement (in which Zanuccoli waived the right to file the Petition) and by the fact that Zanuccoli got everything he

3

bargained for and there was simply nothing for him or Attorney Sorokin to appeal. It, too should be summarily dismissed because it is simply incredible in the facts and circumstances of this case. See generally United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) (evidentiary hearings on 2255 motions are the exception, not the rule; party seeking an evidentiary hearing must carry "a fairly heavy burden of demonstrating the need for special treatment"); Murchu v. United States, 926 F.2d 50, 57 (1st Cir. 1991) (A 2255 petitioner is not entitled to an evidentiary hearing where his allegations "cannot be accepted as true because 'they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact'").

BACKGROUND[3]

The investigation underlying this case was instituted on March 28, 2002 when the Peabody Police Department received a request to assist an ambulance that had been called to 44 Driscoll Street. Once at that address, the officers responding to the call found an unresponsive white female on the sidewalk in front of the house. PSR at ¶14.

The woman was subsequently identified as Melanie Thompson. Officers performed CPR on Ms. Thompson until the ambulance arrived to take her to Salem Hospital. Notwithstanding the

---

[3]   Except as otherwise indicated, the facts set forth in this pleading are all taken from the uncontested portions of the September 22, 2003 Presentence Report ("PSR") in this matter.

efforts to resuscitate her, Ms. Thompson remained non-responsive.
Id. at 15.

Melanie Thompson died two days later. Tests performed at
Salem Hospital revealed that Thompson had both opiates and
amphetamine in her system. The Massachusetts Medical Examiner
subsequently determined that Thompson died from acute opiate
intoxication, i.e., a heroin overdose. Id. at 16.

After Thompson was taken to Salem Hospital, officers spoke
with a cooperating witness ("the CW") who had been with Thompson
prior to her collapse. The CW stated that he/she had driven
Thompson to meet with Melanie Thompson's ex-boyfriend "Tony"
(later identified as Zanuccoli) earlier in the day. The CW
indicated that Thompson had purchased heroin from Zanuccoli that
day and that Thompson collapsed shortly after taking it. The CW
stated that he/she was willing to make an additional purchase of
heroin from Zanuccoli and to record conversations with him. Id.
at 17-18.

The CW placed a consensually recorded telephone call to
Zanuccoli on April 1, 2002 at approximately 1:35 p.m. to order
heroin. In the call, the CW asked Zanuccoli for a quantity of
heroin and Zanuccoli said he could get it. The CW told Zanuccoli
that he/she would meet him at the Mason Tannery in Salem (where
Zanuccoli worked) in a half hour. Id. at 19-20.

The CW was then given a transmitting device, $100 in

official government currency and the CW and his/her car were searched. After the search, the CW was surveilled as he/she drove to the Mason Tannery where he/she arrived at approximately 2:05 p.m. Id. at 21.

Agents were able to watch (and listen to) the CW make contact with Zanuccoli outside the Mason Tannery.[4] The CW told Zanuccoli that he/she wanted "the same stuff that Melanie got last Thursday." Zanuccoli acknowledged having made the sale to Melanie Thompson the previous Thursday and remarked that "it knocked her on her ass." Zanuccoli then said that Melanie had done the whole $50 on Thursday and that she shouldn't have. Zanuccoli then gave the CW two $50 bags of heroin. Id. at 22.

Once the transaction had been completed, Zanuccoli was arrested outside the Mason Tannery. Zanuccoli immediately admitted having gotten the heroin from an associate who was identified and also arrested. Zanuccoli was also found to have the $100 in official government currency that had been provided to the CW in his pants pocket. Id. at 23

Agents also met with the CW who turned over two plastic bags containing heroin. As set forth above, Zanuccoli also acknowledged that he had sold the heroin to the CW. Id.

---

[4]  Although agents were able to listen to the conversation between the CW and Zanuccoli over the transmitter, the recording failed due to a technical malfunction. The telephone call prior to the meeting was recorded.

After being placed under arrest, Zanuccoli agreed to speak with law enforcement agents and signed a <u>Miranda</u> waiver. Zanuccoli admitted that he had sold a $50 bag of heroin to Melanie Thompson on March 28, 2002 inside the Mason Tannery and acknowledged that he had sold more heroin to the CW immediately prior to his arrest. Zanuccoli stated that Thompson did not appear to be high when she came into the Tannery on March 28 but that she went into the bathroom inside the Posting Room at the Tannery immediately after getting the heroin and appeared to be high when she came out. Zanuccoli said that Thompson was unsteady when she came out of the bathroom and began stumbling as she left the building. Zanuccoli also said that he and another individual had to pick Thompson up and "just about had to about carry her" to the car that was waiting for her in the parking lot. This was of course immediately prior to Thompson's collapse and the call for an ambulance that began the case as set forth above. <u>See</u> Complaint Affidavit, ¶16 (April 2, 2002) (Docket Entry 2 in Crim. No. 02-10149-JLT).

Zanuccoli was thereafter named in a three-count drug indictment (that included the sale of heroin to Thompson). From the beginning of the case, Zanuccoli was advised that the government alleged that the heroin Zanuccoli admitted selling on March 28 to Melanie Thompson resulted in Thompson's death, thereby subjecting him to the enhanced penalty provisions set

forth in 21 U.S.C. §841(b)(1)(c) applicable.  See Plea Agreement,
¶3(A).

Zanuccoli thereafter executed the Plea Agreement.  Among
other things, the agreement contained an acknowledgment by
Zanuccoli that "the distribution charged in Count Two of the
Indictment and the conspiracy charged in Count One of the
indictment resulted in the death of Melanie Thompson and that ...
he is subject to a mandatory minimum sentence of life
imprisonment."  Plea Agreement at ¶3(A).[5]  The Plea Agreement
also contained a waiver by Zanuccoli of "any claim he ha[d] under
Apprendi v. New Jersey, U.S.S.G. § 2D1.1, or on any other basis
to have that determination made by the jury at trial" and a
waiver of any right "to appeal or collaterally challenge" the

_____

[5]  In fact, the defendant faced a maximum sentence of life
imprisonment based on his prior drug trafficking convictions.
See 21 U.S.C. §841(b)(1)(C).  This also raise no Blakely issues.
Almendarez-Torres v. United States, 523 U.S. 224, (1998).  See
also See also United States v. Terry, 240 F.3d 65 (1st Cir.
2001)( in rejecting argument that Apprendi effectively overruled
Almendarez-Torres, the First Circuit noted that: "[defendant]
Terry points out that if you count heads, the combination of the
justices in the majority in Apprendi and in the dissent in
Almendarez- Torres would provide a majority on the Supreme Court
to overrule Almendarez-Torres. Perhaps so, but until
Almendarez-Torres is overruled, we are bound by it.") The
defendant's claim that the 851 Information in this case was not
served based on a typographical error in the certificate of
service also gets the defendant nothing because the record makes
clear that the defendant and his counsel had the 851 and were
aware of it at the time the plea was entered.  See Plea Agreement
, ¶3(A) (defendant acknowledges that he was subject to mandatory
life sentence); PSR at 7 (description of 851 on file).
(b)(1)(C).

adoption of the sentencing positions set forth in the agreement or "any aspect of his conviction or sentence in any post-conviction proceeding." Plea Agreement, ¶6.    The Plea Agreement was tendered to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and contained an agreement by the parties that the appropriate sentence was 240 months.[6]

Zanuccoli 's Rule 11 hearing took place on July 10, 2003. During it, Zanuccoli was again advised of the government's allegation that the heroin he sold resulted in the death of Melanie Thompson and that he therefore faced a mandatory life sentence.    See Transcript of July 10, 2003 ("Plea Tr.") at 3 (Court advised Zanuccoli that he face a minimum mandatory life sentence); 9 (government's summary of facts detailing overdose death of Melanie Thompson).    Judge Tauro also carefully described for Zanuccoli all of the rights he would be giving up in a plea, including his right to put the government to its proof beyond a reasonable doubt to the jury at trial.    Id. at 5-7.[7]    At each step along the way, Zanuccoli indicated clearly and unequivocally that he understood what he was doing and that it was his desire

---

[6]    The Plea Agreement thus anticipated that, based on Zanuccoli's cooperation immediately after his arrest, he would receive a 5K departure and that the appropriate reduction was from mandatory life to 240 months.    That's exactly what happened.

[7]    As set forth above, this is the very thing that Zanuccoli also waived in the Plea Agreement with respect to the overdose issues.

9

to plead guilty pursuant to the terms of a plea agreement that was binding on the Court. Id.

The defendant was sentenced on October 2, 2003. The Court accepted the joint agreement regarding disposition and sentenced Zanuccoli to 240 months in prison. Hence, Zanuccoli got exactly what he bargained for in the Plea Agreement.

**LEGAL STANDARDS**

### A. Habeas Review Under 28 U.S.C. § 2255

Section 2255, Title 28, United States Code, provides a means for collateral attack on the sentence under which a federal prisoner is confined. United States v. Hayman, 342 U.S. 205 (1952). The law is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). "A presumption of finality attaches to criminal convictions once all direct appeals have been exhausted." Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994). See also Barefoot v. Estelle, 463 U.S. 880, 887 (1983). "In order for relief to lie under §2255, the claimed error must be jurisdictional, constitutional, "a fundamental defect which inherently results in a complete miscarriage of justice", or "an omission inconsistent with the rudimentary demands of fair procedure." United States v. Addonizio, 442 U.S. 178, 185 (1979); Hill v. United States, 368 U.S. 424, 428 (1962). "Post

10

conviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." <u>Singleton</u>, 26 F.3d at 236; <u>See also</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 634-634 (1993).

## B.  Relitigation of issues under 28 U.S.C. § 2255

A fundamental component of collateral review under 28 U.S.C. § 2255 is that it does not permit a convicted person from relitigating issues already raised at trial or sentencing.  <u>See</u>, <u>e.g.</u>, <u>Singleton v. United States</u>, 26 F.3d 233, 240 (1st Cir. 1993); <u>Murchu v. United States</u>, 926 F.2d 50, 55 (1st Cir. 1991)(issues resolved by a prior appeal will not be reviewed again by a motion pursuant to 28 U.S.C.  2255 motion) .  A petitioner cannot escape this bar merely by recasting claims in different nomenclature.  <u>Tracy v. United States</u>, 739 F.2d 679, 682 (1st Cir. 1984).  <u>See also</u> <u>Field v. Mans</u>, 157 F.3d 35, 40 (1st Cir. 1998)("law of the case" is prudential principle that "precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided.").

A criminal defendant is also not entitled to relitigate issues that *could have been raised* on direct appeal, but were not, absent a showing of cause excusing the default and actual prejudice resulting from the error of which he complains. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982); <u>Suveges v.</u>

11

United States, 7 F.3d 6, 10 (1st Cir.1993) (holding that a party must show cause and prejudice to raise an objection not argued on direct appeal in a § 2255 motion).  Hence, Zanuccoli bears the burden of showing cause and prejudice to avoid summary dismissal.

### C.  Ineffective Assistance of Counsel

Zanuccoli's response to these principles is to allege--for the first time--that Attorney Sorokin provided constitutionally defective representation in the course of the underlying case. Petition, Claims 1-4.   The Sixth Amendment to the United States Constitution states that "in all criminal prosecutions, the accused shall enjoy the right . . . to have assistance of counsel for his defense."  U.S. Const. Amend. VI.  "It has long been recognized that the right to counsel is the right to effective assistance of counsel."  McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970).  However, the United States Supreme Court has also held that "judicial scrutiny of counsel's performance must be highly deferential."  Strickland v. Washington, 466 U.S. 668, 689 (1984).  Therefore, courts must "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  Id. at 689.

The standard employed for determining the merits of ineffective assistance claims is whether the assistance of defense counsel was reasonably competent, i.e., whether the quality of defense counsel's representation was within the range

12

of competence expected of attorneys in criminal cases. <u>United States v. Bosch</u>, 584 F.2d 1113, 1121 (1st Cir. 1978). Effective representation does not mean errorless representation and "a choice between trial tactics, which appears unwise only in hindsight, does not constitute constitutionally-deficient representation under the reasonably competent assistance standard." <u>Bosch</u>, 584 F.2d at 1121. <u>See</u> <u>also</u> <u>United States v. Thomann</u>, 609 F.2d 560, 566 (1st Cir. 1979); <u>United States v. Garcia</u>, 698 F.2d 31, 35 (1st Cir. 1983). Moreover, even deficient representation is legally insignificant unless accompanied by actual prejudice. <u>United States v. McGill</u>, 11 F.3d 223, 226 (1st Cir. 1993) ("petitioner must establish both constitutionally deficient performance on his attorney's part and concomitant prejudice").

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the 6th Amendment. Second, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

A §2255 petitioner must demonstrate ineffective assistance of counsel, as well as an entitlement to §2255 relief, by a preponderance of the evidence. <u>Lema v. United States</u>, 987 F.2d

48, 51 (1st Cir. 1993); <u>Barrett v. United States</u>, 965 F.2d 1184,

1186 (1st Cir. 1992).[8]

### D. <u>Summary dismissal of 2255 Claims</u>

Any consideration of the legal sufficiency of the Petition

in this case must also take into account the broad authority

which this Court has to summarily dismiss it.  Although, as set

forth above, the defendant has arguably made a legally sufficient

2255 showing merely by alleging that he told Attorney Sorokin to

appeal, the government is confident that the Court will conclude

that the claim is a fabrication after holding an evidentiary

hearing.  However the Court resolves the legal sufficiency of

that claim, it is absolutely clear that Zanuccoli's remaining

points (Claims 2, 3, and 4 of the Petition) are utterly specious

and that summary dismissal of them is required.

The First Circuit has explained the circumstances under

---

[8]    There is a narrow exception to <u>Strickland's</u> prejudice
requirement for certain claims that are considered to be
prejudicial "<u>per se</u>."  <u>See</u> <u>Ouber v. Guarino</u>,  293 F.3d 19, 32
(1st Cir. 2002) (emphasizing the limited nature of any exceptions
to the general rule that a 2255 Petitioner must demonstrate
actual prejudice flowing from allegedly defective
representation).  One application of that exception is when an
attorney fails to follow a specific direction by a defendant to
file a notice of appeal. <u>See</u> <u>Hernandez v. Reno</u>, 238 F.3d 50, 57
(1st Cir. 2001) ("counsel's failure to comply with a defendant's
request to appeal would be treated as prejudice <u>per se</u>").   The
implication of this exception to Claim 1 of the Petition are
discussed at pages 24-29, <u>below.</u>

which summary dismissal of a Section 2255 motion is appropriate:

> Summary dismissal of a §2255 petition is appropriate if it plainly appears from the face of the motion that the movant is not entitled to relief.  Rule 4(b) of the Rules Governing §2255 Proceedings.  While genuine issues of material fact may not be resolved without a hearing, a hearing is not required where a habeas motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and the records of the case. . . . The court must take the allegations contained in the petitioner's motion as true, except to the extent that they are contradicted by the record or are inherently incredible, and to the extent that they are merely conclusions rather than statements of fact.

Carey v. United States, 50 F.3d 1097, 1098 (1st Cir. 1995) (citations and quotation marks omitted).

In making a preliminary assessment of the merits of a Section 2255 motion, the district court is also entitled to rely upon an "'expanded record that may include, "in an appropriate case, even affidavits."'"  Id. (citations omitted); see also McGill, 11 F.3d 223 at 225. ("In most situations, motions can be 'heard' effectively on the papers, with the parties submitting evidentiary proffers by means of affidavits, documentary exhibits, and the like.").  The burden is ultimately upon the petitioner to establish both the need for an evidentiary hearing, and his entitlement to the relief he seeks.  Id.  See also David v. United States 134 F.3d 470, 478 (1st Cir. 1998) (even if not conclusively belied by the record, §2255 petitions based on vague, conclusory or incredible claims may be summarily

dismissed).

**ARGUMENT**

**A.    The Entire Petition should be dismissed due to the appeal waiver contained in the Plea Agreement**

The threshold issue in this case is whether Zanuccoli can even maintain this action given the clear and unequivocal appeal waiver contained in the Plea Agreement.  As set forth above, the Plea Agreement included an express waiver of appeal rights that included a waiver of the right to appeal "any aspect of his conviction or sentence in any post-conviction proceeding."  Plea Agreement at ¶6.  That waiver should be enforced here where no issue has been raised regarding Petitioner's awareness and understanding of it.  E.g., United States v. Teeter, 257 F.3d 14, (1st Cir. 2001) (presentence waivers of appellate rights, contained in plea agreements, are not forbidden, and are presumptively valid, if knowing and voluntary).

Undoubtedly, Zanuccoli will claim that the appeal waiver cannot reach issues involved in his sentencing that he claims are the result of ineffective assistance of counsel. That argument must fail.  Every Circuit to have addressed the issue has held that a valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack his sentence through a claim of ineffective assistance of counsel in a collateral proceeding . See Williams v. United States, ___ F.3d ___, 2005 WL 129714 (11th

16

Cir. January 24, 2005); United States v. White, 307 F.3d 336,
341-44 (5th Cir. 2002); Garcia-Santos v. United States, 273 F.3d
506, 508-09 (2d Cir.2001); Davila v. United States, 258 F.3d 448,
451-52 (6th Cir.2001); United States v. Cockerham, 237 F.3d 1179,
1183-87 (10th Cir.2001), cert. denied, 534 U.S. 1085, 122 S.Ct.
821, 151 L.Ed.2d 703 (2002); Mason v. United States, 211 F.3d
1065, 1069-70 (7th Cir.2000), cert. denied, 531 U.S. 1175, 121
S.Ct. 1147, 148 L.Ed.2d 1010 (2001). This court should reach the
same result here, where the appeal waiver was clearly set forth
in the Plea Agreement, the defendant was advised of the
government's belief that his rights were restricted and where he
received exactly the sentence that he had bargained for. See
Plea Agreement, ¶6(2) (extending appeal waiver to the district
court's adoption of any position regarding sentencing adopted in
the Plea Agreement). Compare as to Claim 1 Alcantara v. United
States, No. 02 Civ. 5991, 2003 WL 102873, at *2 (S.D.N.Y. Jan.
10, 2003) (refusing to apply Roe v. Flores-Ortega, 528 U.S. 470,
477 (2000), where petitioner waived his right to appeal); Cuevas
v. United States, No. 01 Civ. 6672, 2002 WL 372918, at *3
(S.D.N.Y. Mar. 8, 2002) ("As long as a defendant has agreed to a
sentence within the stipulated guideline range, and the defendant
is sentenced within that range, the defendant has obtained the
benefit of his bargain."); Rosa v. United States, 170 F.Supp.2d
388, 408 (S.D.N.Y.2001) ("[H]is attorney was not ineffective in

failing to file a notice of appeal because no appeal could be
pursued under the Plea Agreement."); and Castro v. United States,
No. 00 Civ. 1191, 2000 WL 1373134, at *1 (N.D.N.Y. Sept. 19,
2000) ("Petitioner cannot claim to have been denied the very
right he knowingly and voluntarily waived.") with Carron v.
United States, 2004 WL 1859346 (6th Cir. 2004) (reversing
determination that appeal waiver could apply to 2255 claim that
defense counsel had failed to file notice appeal as directed).
See also Flores-Ortega, 528 U.S. at 489 n. 1 ("[T]here is no
claim here that Flores-Ortega waived his right to appeal as part
of his plea agreement[.]") (Souter, J., concurring); Campusano v.
United States, 2004 WL 1824112, *6 (S.D.N.Y. 2004) ("Unless a
defendant asks his attorney to file an appeal that raises one of
the permitted grounds for appeal despite the plea waiver, the per
se exception cannot apply.  To hold otherwise would be tantamount
to requiring an appeal in every case, despite the appeal waiver,
lest counsel be considered ineffective."); United States v.
Rentie, 2004 WL 2108259, *4 (N.D.Tex. 2004) ("Although the
Supreme Court recognized in Flores-Ortega that a counsel's
failure to file an appeal that the defendant would have otherwise
pursued amounts to ineffective assistance of counsel, as
defendant Rentie waived his right to appeal, such holding does
not control this case")(citations omitted).  Hence, absent a
clear claim that the inclusion of the appeal waiver in the plea

18

agreement was itself ineffective assistance of counsel, even

Claim 1 of the Petition fails due to the waiver of appeal in the

Plea Agreement.

**B.    Neither the conduct of the victim nor the defendant's supposed status as a "joint seller" or a "drug addict" can entitle the defendant to relief**

Claim 2 of the Petition argues that Zanuccoli received

ineffective assistance based on certain conclusory claims of

misconduct asserted against Attorney Sorokin.  These

allegations--that Attorney Sorokin failed to disclose a letter

(which letter is neither identified or produced) from the

victim's sister that supposedly showed the victim wished to

commit suicide and that Zanuccoli was "just a co-purchaser of

drugs and an addict as well"--are wholly conclusory and should be

dismissed based on that fact alone.[9]  In addition, however, they

---

[9]    The Petition contains few factual allegations, no
supporting information and no basis on which to even assess much
less decide what the specifics of Zanuccoli's claims may be.
Because the Petition ignores the requirements of Rule 2(b) of the
Rules Governing Section 2255 proceedings and is facially
inadequate to support a legitimate section 2255 claim, it should
be dismissed. E.g., United States v. Labonte, 70 F.3d 1396, 1413
(1st Cir. 1995), overruled on other grounds, 520 U.S. 751 (1997)
(conclusory statements that lack factual basis are insufficient
to support a § 2255 motion); Ellzey v. United States, 324 F.3d
521, 523-24 (7th Cir. 2003) (§ 2255 motion that claims
ineffective assistance of counsel and lacks factual elaboration
does not comport with Rule 2(b)); United States v. Arestigueta,
2001 WL 929755 (D. Me. Aug. 14, 2001) (habeas application must
rest on a foundation of factual allegations alleged under oath).
See also David v. United States 134 F.3d 470, 478 (1st Cir. 1998)
(even if not conclusively belied by the record, §2255 petitions
based on vague, conclusory or incredible claims may be summarily
dismissed).

also fundamentally misapprehend the principles governing overdose

cases brought under 21 U.S.C. §841 and should therefore be

dismissed even if there was some basis on which to conclude that

Attorney Sorokin did anything wrong.[10] See Perron v. Perrin, 742

F.2d 669, 673 n.2 (1st Cir. 1984)("If it is easier to dispose of

a claim on the ground of lack of prejudice, that course should be

followed.").

The overdose provisions set forth in section 841 provide

for enhanced penalties for drug traffickers if "death or serious

bodily injury results from the use of such substance." 21

U.S.C.§841(b)(1)(C).  Federal courts interpreting these

provisions have consistently interpreted section 841 as imposing

strict liability on anyone whose drugs cause serious bodily

---

[10]    There isn't.  Attorney Sorokin knew that Zanuccoli had
been caught red-handed selling heroin to the CW, had admitted
(both on tape and in his post-arrest statements) selling heroin
to Melanie Thompson and seeing her collapse, and that the cause
of Melanie Thompson's death--a heroin overdose--could not be
seriously disputed.  Hence, Sorokin also understood that his only
realistic objective was to free Zanuccoli from a mandatory life
sentence that resulted from the overdose and Zanuccoli's three
prior drug felony convictions by positioning Zanuccoli for a 5K1
departure.  See PSR at ¶¶48,49, and 56. Having achieved that
goal, Sorokin's strategy should not be second guessed.  E.g.,
United States v. Lema, 987 F.2d 48, 51 (1st Cir. 1993)(habeas
court must evaluate the challenged conduct "from counsel's
perspective at the time" and must make every effort "to eliminate
the distorting effects of hindsight"); Barrett v. United States,
965 F.2d 1184, 1186 (1st Cir. 1992) (habeas petitioner must
demonstrate that counsel's error "clearly resulted from neglect
or ignorance rather than from informed, professional judgment"
and "strategic choices made after thorough investigation of law
and facts relevant to plausible options are virtually
unchallengeable").

injury or death.  E.g., United States v. Soler, 275 F.3d 146 (1st

Cir. 2002)("when a defendant deals drugs and a user of those

drugs dies as a result, section 841(b)(1)(C) applies without any

independent proof that the death was a reasonably foreseeable

event").  "The statute puts drug dealers and users on clear

notice that their sentences will be enhanced if people die from

using the drugs they distribute." United States v. Patterson, 38

F.3d 139 (4th Cir. 1994).  Thus, section 841 doesn't require that

the defendant dealt directly with the victim or that the death

was foreseeable.  It is enough that the drugs for which the

defendant is legally responsible "result" in death.  See also

Soler, 275 F.3d at 152 ("When the defendant's own conduct has

caused the harm...a rule of strict liability applies"); United

States v. McIntosh, 236 F.3d 968, 972 (8th Cir.2001) (in the

context of subsection 841(b)(1)(A), "giving effect to [the

statute's] plain meaning prohibits us from superimposing upon the

statute a foreseeability or proximate cause requirement").

   These principles demonstrate that none of the issues raised

in Claim 2 would have any bearing in this case even if they were

true.  For example, even assuming that the defendant never

intended to harm Melanie Thompson (and the government assumes

that he did not), intent issues are irrelevant in overdose cases.

See Soler, 275 F.3d at 152 (Congress's failure to include a

scienter requirement in the overdose provisions of section 841

demonstrate that no such requirement was intended). Similarly, even if the defendant could show that the victim in this case had wanted to harm herself by taking drugs, the fact is that she choose to do it through illegal drugs that the defendant sold and that he as the supplier is therefore responsible. See United States v. McIntosh, 236 F.3d 968, 971 (8th Cir.2001) ("From the statute's language, it is clear Congress intended to expose a defendant to a more severe minimum sentence whenever death or serious injury is a consequence of the victim's use of a controlled substance that has been manufactured or distributed by that defendant."). Finally, if there was evidence in this case that Zanuccoli was a "co-purchaser of the drugs" or that he was himself a drug addict, that would also not effect his conviction or his responsibility for Melanie Thompson's death under section 841. E.g., United States v. Castro, 279 F.3d 30, 33 (1st Cir. 2002) (so long as defendant either sold or aided abetted the sale of an illegal controlled substance, he is liable under section 841 "[r]egardless of whether [defendant] was acting to help the buyer or the seller...."); Powell v. Texas, 392 U.S. 514 (1968) (drug addiction is not a defense to a criminal charge). See also Soler, 275 F.3d at 151 ("By its terms, the statute of conviction applies whenever "death ... results" from the use of drugs supplied by the defendant").

   C.   **The defendant waived his right to have the overdose
        issues heard by the jury**

Zanuccoli fares no better with his claims that when he was sentenced for conduct that was "not charged in the indictment" and that he was not informed by his counsel of "the burden of proof" in violation of the Fifth Amendment and "Apprendi." Petition, Claim 3.  In fact, the Court described to the defendant in detail his right to put the government to its proof beyond a reasonable doubt by proceeding to a trial in front of a jury. Plea Tr. at 5-6.  Moreover,  the Plea Agreement contained an express waiver of the defendant's right to have the overdose issues decided by a jury, whether "under Apprendi or on any other basis."  Plea Agreement at ¶3A.  Where, as here, that waiver was procured in order to avoid a possible mandatory life sentence, it must be enforced.  E.g., United States v. Lopez, 300 F.3d 46, 58-60 (1st Cir. 2002) (defendant waived claim that indictment failed to allege drug quantity, where defendant pleaded guilty despite being aware of Apprendi issue, and did so to avoid possible reindictment; court noted such a waiver was "one of the clearest examples of waiver imaginable"); United States v. Gaudet, 81 F.3d 585, 590 (5th Cir. 1996) (defendant can implicitly waive right to indictment) (citing cases).[11]

_____

[11]  Because the sentence in this case was also within the statutory maximum for the crime charged in the indictment, there could also be no prejudice even if the argument had not been waived.  See McIntosh, 236 F.3d at 976 (8th Cir. 2001) (where the district court enhanced the defendant's sentence under § 841(b)(1)(A) after finding by a preponderance of the evidence that "death or serious bodily injury" had resulted, Apprendi did

23

D. **The defendant's sentence was not driven by the guidelines**

Zanuccoli's next claim is that Attorney Sorokin erred when he told Zanuccoli that he was facing a mandatory life sentence and the guidelines were not the thing that was driving his sentence. This also cannot provided any cognizable claim for section 2255 relief because that advice was correct. Because Zanuccoli sold the heroin that resulted in Melanie Thompson's death, he faced a mandatory 20 year sentence that increased to life due to his prior drug trafficking conviction. See PSR ¶7, 48, 49 (filing of 851 Information based on prior convictions for heroin distribution).[12] In fact, the only way for Zanuccoli to reduce that sentence was to plead guilty and cooperate with the government. Because Sorokin's advice was correct in all respects and is the only reason that Zanuccoli will not be spending the rest of his life in jail, that advice can hardly be constitutionally deficient.

E. **The failure to appeal claim also fails**

The only remaining claim contained in the Petition is Claim 1, alleging that Attorney Sorokin failed to perfect an appeal

---

not apply because the defendant was sentenced to 20 years' imprisonment, which is the authorized maximum sentence under § enhancement); United States v. Rodriguez, 279 F.3d 947 (11th Cir. 2002)(same).

[12] By the time he was arrested in this Court, Zanuccoli had amassed 18 criminal history points in what was literally a lifetime of drug trafficking and other crime. See PSR ¶62.

when directed to do so by Zanuccoli. For the reasons set forth
above, it should also be summarily rejected based on the appeal
waiver set forth in the Plea Agreement. See discussion at pp.
15-18, infra.

Should for some reason the Court conclude that the appeal
waiver does not extend to Claim 1, the court must then deal with
the issue of whether this Claim is categorically different from
the other claims due to the doctrine of per se prejudice
applicable if a lawyer disregards his client's explicit request
that an appeal be filed. See Roe v. Flores-Ortega, 528 U.S. 470,
120 S.Ct. 1029 (2000). The Petition in this case contains such
an allegation. Petition at 5 ("On July 10, 2003, after I was
sentenced, I instructed my counsel to appeal my sentence. He
stated "its as good as done," but I don't see no issues to raise.
I told him to appeal my sentence anyway. He has not."). Compare
Affidavit of Leo Sorokin (attorney Sorokin states that he has no
memory of any such request and that his practice is to file
notices of appeal whenever a defendant makes such a request or
otherwise appears to have a legitimate appellate issue). Were
the court to conclude that Zanuccoli made such a request, the
correct remedy would be to grant the Petition and allow an appeal
to be filed now. See United States v. West, 240 F.3d 456, 459
(5th Cir. 2001) (A new opportunity to directly appeal is the
remedy for a Flores-Ortega violation); Bonneau v. United States,

25

961 F.2d 17, 23 (1st Cir. 1992) (dismissing § 2255 petition and remanding so that petitioner could take direct appeal).

Although the words that Zanuccoli has used track the requirement of <u>Flores-Ortega</u>, that fact does not entitle him to the relief that he seeks.  This court must still conclude that what Zanuccoli claim is true and not an after the fact fabrication.  Since, as is set forth below, that claim is incredible based on the record, this Court can deny this claim without an evidentiary hearing.

Any consideration of the likelihood that Zanuccoli requested an appeal must begin with the fact that he pled guilty. Such a plea is a "highly relevant factor". <u>Flores-Ortega</u>, 528 U.S. at 480, 120 S.Ct. 1029.  "A guilty plea reduces the scope of appealable issues and ... may indicate that the defendant seeks an end to judicial proceedings." <u>Flores Ortega</u>, 120 S.Ct. at 1036. Here, of course, Zanuccoli pled guilty to free himself of the possible imposition of a mandatary life sentence, a very likely result given the strength of the government's case and the seriousness of Zanuccoli's prior record.  In the circumstances, Zanuccoli's plea was a very favorable one and was specifically not the kind of deal that a rational defendant would jeopardize by appealing. See <u>Ryan v. United States</u> 97 F.Supp.2d 190, 195 (D. Mass. 2000)(Tauro, J. and Woodlock, J) (where effect of plea agreement was to avoid exposure to a precipitously long term of

imprisonment, no reason to think that defendant would want to appeal").

Moreover, the likelihood that Zanuccoli would have requested an appeal is also undercut by the nature of the Plea Agreement in this case and the fact that Zanuccoli got *exactly* what he had bargained for. Id. at 194 ("A defendant who received the benefit of a bargained for sentence would presumably have little interest in pursuing an appeal"). As set forth above, Zanuccoli signed an 11(c)(1)(C) plea that called for an agreed upon disposition of 240 months. And that's exactly the sentence that he got. Where, as here, th defendant's expectations are completely fulfilled, there was no reason for him to appeal and there is no reason now to credit the unsubstantiated claim he has made. Flores-Ortega, 120 S.Ct at 1036 (attorney who advises client that guilty plea will result in a specified sentence has no reason to consult about a possible appeal after guilty plea is knowingly made and sentence imposed is consistent with attorney's prediction). The fact that even Zanuccoli admits that Attorney Sorokin told him there was nothing to appeal (see Petition, Claim 1), that the agreement that Zanuccoli signed also contained an appeal waiver, and that Zanuccoli did not question the absence of any appellate procedures until he wrote Attorney Sorokin on August 10, 2004 letter (more than 10 months after the sentencing) also shows that this is simply not a case in which a rational defendant

27

would have appealed and that this claim should also be summarily
rejected. See Quintero v. United States, 316 F.Supp.2d 711
(N.D.Ind. 2004)(denying Petition where plea agreement contained
waiver of right to pursue direct appeal, and petitioner
acknowledged that he understood plea agreement before signing
it); United States v. Taylor, 339 F.3d 973, 980 (D.C.Cir.2003)
(denying Flores-Ortega claim where there were no meritorious
grounds for appeal). The absence of any viable appellate issue is
another reason to believe a rational defendant in Petitioner's
place would not have sought an appeal and that Zanuccoli's
belated claim in the Petition is simply not credible. [13]

## CONCLUSION

The defendant in this case was ably represented by an
experienced and careful member of the Federal Defender's Office.
Faced with overwhelming evidence that the defendant's drugs had
resulted in the death of a customer and that the defendant was
facing a mandatory life sentence, Attorney Sorokin negotiated a
favorable plea agreement that enabled the defendant to avoid
spending the rest of his life in jail.  The defendant repeatedly

---

[13]  Although Attorney Sorokin has no memory of any request
made by Zanuccoli, his careful practice of filing an appeal
whenever it is requested or where he believes a potentially
meritorious grounds for appeal exists also supports dismissal in
this case.  See Ryan, 97 F.Supp. 2d at 195 n.13 (relying on
practice of experienced federal defender in denying petition
claiming appeal was not filed).

told the district court that he understood the Plea Agreement (which included a waiver of appeal and an express waiver of his Apprendi rights, understood its consequences,  and that he wanted to enter a plea pursuant to it.

The defendant thereafter got exactly what he bargained for-a sentence of 240 months.  Notwithstanding that, the defendant has now conjured up claims of attorney misconduct that are simply belied by the record and are otherwise incredible.  Because the conclusory claims in the Petition are contrary to law and belied by the record and common sense, the government requests that they be summarily dismissed.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
(617) 748-3207

### CERTIFICATE OF SERVICE

I, JOHN A WORTMANN, JR., Assistant U.S. Attorney, do hereby certify that I have this 28th day of January, 2005, served the copy of the foregoing by mail to the Petitioner.

/s John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney